UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                                                    )
            v.                                      )            Criminal No. 04-10367-DPW
                                                    )
ADAM STUPAK                            )

**SENTENCING MEMORANDUM**

Defendant Adam Stupak submits this memorandum to assist the court in

determining the appropriate sentence.  For the reasons set forth in detail below, the court

should sentence Mr. Stupak to a six-month term of probation.  That sentence is

"sufficient, but not greater than necessary" to comply with the purposes set forth in

18 U.S.C. § 3553(a)(2).  It is a sentence that reflects the seriousness of the offenses of

conviction, promotes respect for the law, provides just punishment, affords adequate

deterrence and protects the public from further criminal conduct by Mr. Stupak.  Finally,

it is a sentence that is consistent with a properly calculated Advisory Sentencing

Guideline ("ASG") range after available departures are considered.

A six month term of probation is appropriate even before the court takes into

consideration the government's anticipated motion for a substantial assistance departure.

Mr. Stupak's cooperation played a role in the decision of his employer at the time,

Serono, Inc., to pay over $700 million to settle criminal and civil health care fraud and

false claims actions brought by the government.  His decision to testify twice before the

grand jury provided important evidence against four persons he used to work with at

Serono and his testimony at trial against his former colleagues was central to the

government's case.  Despite Mr. Stupak's truthful testimony, all of his colleagues were

acquitted of all charges.

In light of Mr. Stupak's background and history, the nature and circumstances of his offense and his indispensable cooperation with federal prosecutors, the court should have no doubt that a short term of probation is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). A term of probation longer than six months or a sentence with any incarcerative component would be greater than necessary to accomplish those goals.

## Argument

### I.    The Court Is Required To Impose A Sentence Sufficient But Not Greater Than Necessary To Comply With the Purposes Set Forth in 18 U.S.C. § 3553(a)(2)

After *Booker*, a sentencing court must impose a sentence minimally "sufficient, but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2). 18 U.S.C. § 3553(a). *See also United States v. Foreman*, 436 F.3d 638, 643-44 & n.1 (6th Cir. 2006) ("a district court's mandate is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of section 3553(a)(2)"); *United States v. Cawthorn*, 419 F.3d 793, 802 (8th Cir. 2005) ("district court's duty" is that it "shall impose a sentence sufficient but not greater than necessary"). The court is required to consider all of the following sentencing factors:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed--
>
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> **(B)** to afford adequate deterrence to criminal conduct;
>>
>> **(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the [United States Sentencing G]uidelines--

…

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission …

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A six month term of probation is more than consonant with all of the sentencing factors set forth in § 3553 and would recognize that Mr. Stupak is a flesh and blood individual who stands before the court at a particular point in his unique life.  Even when the Sentencing Guidelines were mandatory, the First Circuit Court of Appeals emphatically emphasized that this should be the goal of a sentencing judge:

> [T]he guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier system.  This too must be remembered, however.  It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

*United States v. Olbres*, 99 F.3d 28, 36-37 (1st Cir. 1996) (citation omitted).

3

II.    **The Proposed Sentence Is Appropriate For These Offenses Committed By This Defendant**

A.    **Mr. Stupak's History and Characteristics**

Few defendants who stand before the court convicted of a serious offense have lived the kind of life, accomplished the types of things and dedicated themselves to family and community the way Mr. Stupak has. Once the court considers the history and characteristics of this man, the court will have no doubt that a short term of probation is the appropriate sentence.

A desire to help others who are less fortunate than he is and who truly need help, and the will to translate that desire into action, are what characterize Mr. Stupak's life. A job Mr. Stupak had before he joined Serono required him to call on Lincoln Hospital in the Bronx, New York. That hospital had an AIDS ward for children. In the mid-1990s, healthy people were afraid of people with AIDS and HIV, and the children's ward was a forlorn place.

On his own time, Mr. Stupak would visit the children at the AIDS ward. He would sit with them, talk with them and spend time with them. Mr. Stupak did so out of concern that "no one wanted to help" people with HIV. *See* PSR at ¶ 137. He was working full time at the time, he had finished earning an MBA degree at night, he was married and he was helping raise his own children, who now number four, aged 3 to 14. Still he found time for strangers – disadvantaged, sick kids in an AIDS ward in the Bronx that nobody else seemed to care about. Ironically, Serono's work in the area of HIV treatment is what attracted Mr. Stupak to the company. He believed in the drugs Serono was developing and marketing.

Mr. Stupak also volunteered his time to help other disadvantaged youths.  In 2004, he served as a mentor to public school children in the South Bronx, a poor, very tough and dangerous place.  He also has been very active in his community over many years.  He has coached little league baseball and catholic league basketball.  Through his synagogue he volunteered on numerous occasions to assist with youth programs and with special events at shul.  *See* Letter from Rabbi Heshy Blumstein, attached as Exhibit 1.  In 2003, Mr. Stupak and his wife Susan Sharaby were honored by Chabad and recognized as persons who "exemplify the true essence of dedication, friendship and generosity to both their families and the entire community."  Mr Stupak's desire to help others even led to an unsuccessful campaign for a seat in the New York State Senate in 1992, in which he got 30% of the vote.   Nothing demonstrates the depth of Mr. Stupak's commitment to helping others in need more than his reaction to the events in Manhattan of September 11, 2001.  Many of us watched in horror as events unfolded on our television screens.  The thought crossed many of our minds that we should do something to help.  For most of us, that thought passed and we went on with our own lives.  But not Mr. Stupak.  On September 15, 2001, Mr. Stupak jumped in his SUV and made the rounds to every business he could think of seeking donations. He filled his SUV to the brim with everything from bottled water to food to towels, drove to lower Manhattan and finagled his way past checkpoints and security right to ground zero.  He parked, opened his truck and handed out everything in his truck to firemen, police officers and other first responders.  Pictures of that day are attached hereto as Exhibit 2.  A more revealing image of Mr. Stupak's true character can hardly be imagined.

### B.    The Nature and Circumstances Of the Offense

There can be no serious doubt that Mr. Stupak would not be standing before this or any other court facing sentencing on a felony conviction had he not gone to work for Serono. Even though the company paid over $700 million to settle civil and criminal health care fraud claims for a wide variety of rampant illegal conduct, Mr. Stupak is the only individual employee who stands convicted of any wrongdoing. He held no management position of any real authority in the company – he was one level above salesman. He made no meaningful policy decisions at Serono. He certainly did not mastermind any illegal conduct. He instructed no one to break the law. Nor did he put a single illicit dime in his own pocket or profit in any way from illegal conduct.

What Mr. Stupak did was participate in a sales program the government later would deem illegal. He did so for a total period of three days, and then he refused to participate further. *See* PSR at ¶¶ 81-84. He offered a trip to Cannes, France to a grand total of three doctors his sales team called on regularly. He did not feel comfortable with the Cannes program. He felt that Serostim was a good drug that should sell itself on its own merits, and he was confident that his group would meet its sales goals without offering the Cannes trip. After calling on three doctors over a two-day period, he refused to offer the trip to anyone again. When one of his doctors changed his mind about going on the trip, Mr. Stupak instructed his sales representative to retrieve Serono's check for airfare and expenses and it was returned to the company.

Mr. Stupak could scarcely have done less to put himself in the position he now finds himself. He stated repeatedly at his plea hearing that he did not believe that he was breaking the law. Indeed, his four indicted colleagues were acquitted in near-record time

for their participation in offering the Cannes trip to other doctors.  *See United States v. Bruens, et al.*, Criminal No 05-10102-JLT.[1]  At the time of the Cannes trip offer in March 1999, Mr. Stupak had not received any anti-kickback training.  In early 1999, awareness in the pharmaceutical industry of the anti-kickback statute was nowhere near the level it has developed into today.  The Health Care Fraud unit of this United States Attorney's Office had yet to make its reputation with successful high-profile prosecutions of major international corporations like Serono.

This is not a man of no scruples and a mindset to do whatever it takes to succeed in the business world, no matter how unethical or even illegal his conduct might be.  This is a good man who got used by a bad company he had no reason at the time to doubt.

### C.    Punishment and Deterrence

A short term of probation reflects the seriousness of the offense, promotes respect for the law, provides just punishment and affords both general and specific deterrence.  A sentence with any incarcerative component would be greater than necessary to comply with these 18 U.S.C. § 3553 factors.

A felony conviction, in and of itself, is serious punishment for a  person who has worked so hard to maintain a stellar reputation.  A felony conviction in a high-profile health care fraud prosecution of a major international corporation, in the age of Google, is another thing entirely.  Mr. Stupak has been unable to hold a decent job since his guilty plea.  He may not be able to keep his present job because he needs to obtain a New York

---

[1]    The jury went out late one afternoon and had reached a verdict a little over an hour into deliberations the next morning.

real estate license to perform all of his responsibilities. His felony conviction and its

ready accessibility in an increasingly online world may make that impossible.

Mr. Stupak's family has suffered as well. His guilty plea, with which his wife

does not agree, may prove to be the breaking point in their 18-year marriage. Mr.

Stupak's wife, Susan Sharaby, has had to devote more time to work to make ends meet.

That has left less time for her children. *See* PSR at ¶¶ 140-143; Letter from Susan

Sharaby, Exhibit 1 hereto.

As for deterrence, the court should have little doubt that Mr. Stupak will live out

the rest of his life the same law-abiding way he has lived it so far. Indeed, he exhibits

many of the characteristics that the Sentencing Commission has identified as indicators of

reduced rates of recidivism. He is 42 years old, has an advanced college degree, a stable

employment history, is married with a family and is a non-violent offender who does not

use drugs. Two recent studies conducted by the Sentencing Commission, entitled

Measuring Recidivism: The Criminal History Computation of the Federal Sentencing

Guidelines (hereinafter "Release 1"),

http://www.ussc.gov/publicat/Recidivism_General.pdf; and A Comparison of the Federal

Sentencing Guidelines Criminal History Category and the U.S. Parole Commission

Salient Factor Score (hereinafter "Release 2"), http://www.ussc.gov/publicat/

RecidivismSalientFactorCom.pdf, include the following findings:

- Age: "Recidivism rates decline relatively consistently as age increases," from
  35.5% under age 21, to 9.5% over age 50.[2] Under the Parole Commission's
  Salient Factor Score (SFS), which is a better predictor of recidivism than Criminal
  History Category, the older the defendant is and the fewer the number of prior

---

[2] Release 1 at 12 & Exhibit 9.

commitments, the less likelihood of recidivism.  Age is a powerful component of recidivism prediction, which the Guidelines do not take into account.[3]

- Employment:  Stable employment in the year prior to arrest is associated with a lower risk of recidivism.[4]

- Education:  Recidivism rates decrease with educational level (no high school, high school, some college, college degree).[5]

- Family:  Recidivism rates are associated with marital status (never married, divorced, married).[6]

- Illicit drug use: offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0%) than those not using illicit drugs (17.4%).[7]

- Non-Violent Offenders sentenced under the fraud, larceny and drug guidelines are the least likely to recidivate.[8]

Mr. Stupak's history and characteristics, the nature and circumstances of this offense and the Sentencing Commission's own data indicate that he will not come before this or any other court, ever, on new charges.

### III.    A Six-Month Term Of Probation Is Consistent With A Properly Calculated Advisory Sentencing Guideline Range

Even without taking into consideration Mr. Stupak's "courageous,"[9] extensive, important and truthful cooperation, the court should find that a six month term of

---

[3] Release 2 at 8, 13-15.

[4] Release 1 at 12 & Exhibit 10.

[5] *Id*. at 12 & Exhibit 10.

[6] *Id*. at 12 & Exhibit 10.

[7] *Id*. at 13 and Exhibit 10.

[8] *Id*. at 13 & Exhibit 11.

probation is within a properly calculated ASG range, adjusted for well-recognized non-cooperation departures.

The court should first find that the ASG calculation in the PSR is not accurate. The PSR loss calculation is inconsistent with the sworn trial testimony offered by the government in the *Bruens* case through its witness Jeffrey Hart, Vice president of Specialty Channels and Reimbursement Strategies at Serono. Based solely on offense conduct submitted by the government, the PSR calculates the loss figure for the three substantive counts of conviction by multiplying 168 milligrams per four-week prescription of Serostim times three (because a course of treatment was three months long), times a $42 cost per milligram, times 30 prescriptions Mr. Stupak had agreed to solicit (ten prescriptions per doctor). The resulting dollar figure representing intended loss is $635,040 (168 mg x 3 = 504 mg x $42 per mg = $21,168 per prescription x 30 prescriptions = $635,040), resulting in a 10 level increase in the ASG level. *See* U.S.S.G. § 2B4.1.

The PSR's approach is correct, but the numbers it plugs in are contrary to Mr. Hart's sworn trial testimony. Mr. Hart testified that a 28-day dose of Serostim was 110 mg, not 168, and that the cost per mg was $30, not $42. *See* Transcript, Day 6 at 6-204-205, attached hereto as Exhibit 3. Thus, according to the government's own evidence from its own witness at the *Bruens* trial, the intended loss should be $297,000, not $635,040 (110 mg x 3 = 330 mg x $30 per mg = $9,900 per prescription x 30 prescriptions = $297,000).

---

[9]    In rebuttal, the government told the jury in the *Bruens* case that "what Adam did, pleading guilty and coming before you and testifying in this case, was a very courageous act," and that Mr. Stupak testified truthfully. Transcript, Day 11 at 11-51.

Using that loss figure results in an 8 level increase under U.S.S.G. 2B4.1 and 2F1.1, which results in a total ASG level of 13 after acceptance of responsibility. The ASG sentencing range, before the court considers departures or the government's substantial assistance motion, is 12-18 months.

From there, the court should depart downward on grounds of aberrant behavior and that the loss figure produced by the mechanical calculation of the ASG substantially overstates the seriousness of Mr. Stupak's criminal conduct.

A sentencing court may depart downward where a combination of factors warrants it. *See* U.S.S.G. § 5K2.0 Commentary (combination of characteristics and circumstances, none of which alone take the case out of heartland, may warrant departure). *See also United States v. Sklar*, 920 F.2d 107, 117 (1st Cir. 1990) ("We do not mean to imply that factors, inadequate to warrant departure when taken in isolation, may not in combination suffice to remove a case from the heartland") (citation omitted); *United States v. Broderson*, 67 F.3d 452, 458-59 (2d Cir. 1995) (departure where "confluence of circumstances was not taken into account by the guidelines); *United States v. Bowser*, 941 F.2d 1019, 1024-25 (10th Cir. 1991) ("unique combination of factors" warranted departure).

The basis for an aberrant behavior departure is set forth in sections II A and B above. Mr. Stupak's three-day "crime spree" involved the solicitation of the participation of three doctors in a program devised by his superiors at the company he worked for, one of the largest biotechnology companies in the world at the time. Left to his own devices, Mr. Stupak never would have committed a crime. He stopped soliciting the participation of doctors two days into the sales program and had the integrity to make sure that the

11

company recovered a check given to one of the doctors he solicited when that doctor decided not to go on the Cannes trip. That is Mr. Stupak's true character. This offense is entirely out of character with the selfless, generous and law-abiding manner in which he has lived his entire life.

The basis for a departure on grounds that the loss figure greatly overstates Mr. Stupak's culpability is found in application note 11 to U.S.S.G. 2F1.1, which encouraged the court to depart "in a few instances, [where] the loss determined under subsection (b)(1) may overstate the seriousness of the offense. … In such cases, a downward departure may be warranted." 1998 U.S.S.G. § 2F1.1, App. Note 11. Pegging Mr. Stupak's ASG range to a loss figure in the hundreds of thousands of dollars would produce precisely the unjust and inequitable result that Application Note 11 contemplated.

Courts have departed on grounds that loss overstates seriousness where a particular defendant did not enter into a scheme to defraud with full knowledge of the fraud and an initial intent to help make it succeed. *See United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995); *United States v. Nachamie*, 121 F. Supp.2d 285 (S.D. N.Y. 2000); *United States v. Forchette*, 220 F. Supp.2d 914 (E.D. Wis. 2002). In Broderson, the Second Circuit upheld a downward departure on this basis reasoning that the defendant's "criminal intent was significantly different from that of the typical fraud defendant. He did not set out to mislead the government." 67 F.3d at 459.

Using similar language, the *Nachamie* court departed downward on grounds that the loss figure overstated the defendants' culpability: "[t]hese defendants fall into a highly unusual category, which I shall refer to as 'accidental criminals.' In my

experience, most defendants convicted of fraud plan to commit a crime and engage in significant and sustained efforts to create a fraudulent scheme or cause it to succeed. These defendants were different.  I am convinced … that none of the [defendants] entered the scheme with criminal intent." 121 F. Supp.2d at 296 (footnote omitted).  *See also Forchette*, 220 F. Supp.2d at 925 (loss overstates downward departure may be available where, among other things, defendant's "intent in involving himself in the scheme may have been significantly different than of the usual fraud defendant, *e.g.* he may have entered the scheme with honest intentions or with the intent to make good on his obligations").

Courts evaluating a downward departure where loss overstates the seriousness of a particular defendant's conduct have also found it significant that the defendant did not conceive of and organize the fraudulent scheme, benefited from it to a much smaller degree than the persons running the scheme and/or engaged in conduct that only minimally contributed to the overall loss.  *See, e.g.*, *United States v. Costello*, 16 F. Supp.2d 36 (D. Mass. 1998); *Forchette*, 220 F. Supp.2d at 925-926; *United States v. Jackson*, 798 F. Supp. 556 (D. Minn. 1992).

In *Costello*, Judge Gertner departed downward where defendants involved in the theft of property worth in excess of $20,000,000 "did not come up with the scheme at the outset" and whose profit, "at least at the outset, was miniscule compared to the value of the materials stolen." 16 F. Supp.2d at 38.  The court in *Forchette* departed downward where "the scheme in which [defendant] participated was masterminded" by the lead defendant and "defendant's share of the proceeds was consistently minimal, certainly in comparison to the total amount of the loss." 220 F. Supp.2d at 925, 926.

Like the *Broderson* and *Nachamie* defendants, Mr. Stupak is an atypical fraud defendant. He took a job with Serono because he believed that the company was committed to helping AIDS and HIV patients by developing safe and effective medications. He did not set out to engage in fraud, did not mastermind a fraudulent scheme and did not make a dime from it. He also had no control whatsoever over the amount of loss the scheme generated. The doctors he solicited could have written one additional Serostim prescription, or ten or none. Under the circumstances, saddling him with an ASG range reflecting a full $270,000 loss figure greatly overstates his culpability.

Of course, these are not the only available departure grounds. Mr. Stupak expects that the government will file a substantial assistance motion and will recommend a sentence below the ASG range. Indeed, Mr. Stupak did everything he possibly could to assist the government. When he was first contacted by government agents who were investigating Serono, Mr. Stupak freely answered questions and agreed to meet again. He proffered, testified before the grand jury twice and was an important witness at trial. His cooperation was a factor in Serono's decision to settle with the government and pay massive fines. His testimony led to the indictment of four of his former Serono colleagues and permitted the government to present its strongest possible case at trial. He told the truth and did everything the government asked of him, and his contributions were valuable. A six month term of probation is appropriate given Mr. Stupak's substantial assistance to the government.

**Conclusion**

For all of the foregoing reasons, the court should find that a sentence of six months probation is sufficient but not greater than necessary to comply with all of the factors set forth in 18 U.S.C. § 3553(a).

ADAM STUPAK
 By his attorney,

/s/ *E. Peter Parker*
E. Peter Parker
 B.B.O. #552720
151 Merrimac Street
Boston, MA  02114
(617) 742-9099

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 22, 2007.

/s/ *E. Peter Parker*
E. Peter Parker

# Young Israel of Hewlett

*Congregation Ahavat Yisrael*

1 Piermont Avenue  •  Hewlett, New York  11557

Phone: (516) 295-2282

Fax: (516-908-9673

E-mail:  Office@YIHewlett.org  /  Website:  yihewlett.org

Heshy Blumstein, Rabbi

**OFFICERS:**

Dr. Arthur Kornblit, President
Saul Brooks, Vice President
Charlie Miller, Vice President
Eric Miller, Treasurer
Stephen Krown, Financial Secretary
Leah Diamond, Recording Secretary

**BOARD OF DIRECTORS:**

Steve Einhorn
Jeremy Garber
Phyllis Goodman
Jack Hauptman
Nathaniel Lazan
Dr. Gabe Levi
Stanley Meisels
Dr. Allan Roffe
Jay Saltzman
Harold Verschleiser

**SISTERHOOD:**

Amy Goodstein, President

**PRESIDENT EMERITUS:**

Nathaniel Lazan

**PAST PRESIDENTS:**

Sam Bogarsky
Steven Landau
Joel Redler
Nahum Schiffeldrim
Myron Zaklow [Z"L]

**GABBAYIM:**
Saul Brooks
Jack Diamond
Nathaniel Lazan

May 20, 2004

To Whom It May Concern:

This is to advise you that Adam Stupak and his family
are well known to me as members of our synagogue
for many years.  Adam Stupak has volunteered on
numerous occasions, such as assisting with our youth
programs and other special events at our shul.  He has
also been helpful to our office staff at times.  Adam's
volunteer time ranges between 18 and 20 hours.

Should you need further information, please do not
hesitate to advise me.

Sincerely,

Rabbi Heshy Blumstein

Honorable Judge Woodlock
June 18, 2007

Dear Judge Woodlock,

I have been writing this letter to you for over a year now every single night as I try to go
to bed. Parts of this letter have changed as new situations and time has lapsed however
the main points are still the same although I believe much more validated than ever. The
phrase "hindsight is 20/20" is truly a clairvoyant statement for me. The main purpose of
this letter is to give you details of our nightmare the government has caused so when
sentencing for my husband Adam Stupak takes place you will have sympathy and mercy.
Part of the letter is for you to know our personal nightmare and the other is several
circumstances that occurred throughout the several years that I think you should know
about.

Please excuse me if the letter goes off into a tangent as I am riddled with emotion, from
anger to deep sadness, total disgust and fear for what is left of our lives.

If anyone had asked me four years ago who would be the one person I would want to
meet if I had the chance that person would be Moses based on his bravery, leadership and
faith. If you asked me more recently that person would be you but for a very different
reason. I want and need you to know how this nightmare has affected my family! I want
and need to understand just how our government gets away with the horrible, unjust
things they do? I want and need to know how you can help us get our life back?

Recently, the four executives indicted by the government were found not guilty for the
same crime my husband Adam was allegedly accused of. I was thrilled to know that
regular people (the jury) saw so clearly that no fowl play was done here, that innocent
people went to work each day to provide for their families. It is quite clear from this
innocent verdict that Adam is innocent too. The sheer torment my husband and family
have had over the last several years should be more than enough punishment for anyone.

My husband Adam Stupak was approached over the phone by a very friendly FBI agent
regarding an inquiry on his work at Serono. My husband knowing only what he has seen
on television and his repressed desire to be a police officer was more than happy to
answer their questions. Subsequently on thing lead to another and we were seeking legal
council for the most outrageous crimes from almost 10 years ago. Conspiracy, wire fraud,
kick-backs....what???

To say the least we were devastated and my husband began to drift into a deep depression
thinking he failed his family and that he would be going to jail. He would throw up every
morning, could not get out of bed, could not continue his fatherly duties, lost his job and

had to seek professional help as he had suicidal urges. My four children 14, 11, 9 and 4, would see him and not understand why Daddy could not get out of bed. They need their Daddy back!

We hired a lawyer, Evan Slavitt, a Harvard graduate, thinking he would be the best to represent Adam. I was privy to many if not most of the conversations that went on with Evan as I was the one who was capable of focusing and thinking clearly. I told Adam to fight this nonsense however Evan gave Adam 24 hours to decide if he wanted to plead guilty as to avoid the many possibilities of doom. He told us that Adam would lose his family, any money he had as well as go to jail for a minimum of five to fifteen years? No way out! Tell me your honor, what would you do if someone that knows the law told you this and gave you 24 hours to decide your fate? In addition, he told us the "first one in gets the best deal and he sees no other choice".   You met my husband at the court the day he had to plead guilty and you heard his cries while he stated that he could not believe that this is happening as he just went to work to feed and take care of his family as all the other executives did. Your honor, you have been a judge for quite some time and know what goes on behind the scenes. I can't imagine that you agree with any of it but how does the government get away with destroying a wonderful family?

Before the actual plea, I sat with Adam, Evan and Mary Beth Carmody to say to both of them that the judge needs to know Adam was forced to do this. Adam could not think clearly as his life was slipping away. None of this could be real! Evan told us that he would make sure it was done in writing as well as verbally. Well, he obviously miscommunicated quite a lot all along. Your honor, I am so jaded at this point that I truly believe as hindsight has allowed me, that Mr. Slavitt was working in conjunction with Ms. Carmody to lessen a situation that ironically came out in the papers the exact same day that the Serono executives were found not guilty. Mr. Slavitt apparently had his license suspended for some illegal action. Did Ms. Carmody write a letter of character for him? Did she have any calls made on his behalf? Did she do anything to help him so in return he would deliver Adam to make her case? Is there any possiblity that this could happen? Our judicial system is filled with so many entitled and empowered people that are doing terrible things. Is this a far fetched scheme? As far fetched as "six million in six days"???

Our new lawyer, Peter Parker has told us that he felt Mr. Slavitt handled things poorly. Although he was not involved from the beginning he did back track some of the things Evan did. For instance he believes the way he presented the options for Adam was not correct. Strangely, Serono was paying our legal fees in the beginning and than stopped, we found out later that Evan apparently sued Serono and created a hostile situation. If Serono paid our fee's we would have fought this case, however, Evan told us it would cost too much to fight without Serono. He was very poor in giving us information about the case or returning calls however he was quite anxious to get the plea agreement done. He even told us that Mark Sirockman, one of the executives wanted to take the plea agreement if Adam did not. Since Adam did we were told by Evan that Mark would have to serve jail time if he agreed to it while Adam would not. Mark decided to fight it with

Serono paying the freight. I am glad it ended well for him and the others and g-d willing they can all go back to their lives.

After Adam pleaded in your court room, I do not believe you saw this as you probably left the room, but Ms. Carmodys' colleague, US Attorney, Sondra Miles came over to me in a state of hysteria. She was crying and her face was all red with tears streaming. As she approached me and put her hand on my shoulder I was shocked to have her tell me that she is "so, so sorry and Merry Christmas". Adam had to hold me back as I could not believe the audacity of her apology. Once again, hindsight allows me to believe that she understood that Adam was used as a scapegoat as I now believe many other people are due to intimidating, threatening people that just don't care and are more concerned with the political badge of merit from winning a case and not from getting to the truth and creating reform for a better future. Sondra actually had a heart and was subsequently taken off the case for it. I implore you to talk with her about it.

To this day, Adam has had a terrible time finding work as most people don't want a *felon* to work for them and has caused issues both financially and emotionally. The internet has also scarred us for life. Articles pronouncing my husband a conspirator for his own profit! Six million in six months….why is it we are now selling our house since we can't pay our bills and need scholarship assistant for camp and school for my children.
 We have a large part of our savings with lawyer fees as Serono would not pay due to Evan Slavitt's hostile representation, our marriage is on a very thin thread and we are living day to day. I work more hours and spend less time with my kids just to try and pay my bills. Can you explain to me why our country does not care? We could be homeless eating bugs and no one would care but our family and friends. It is so inconceivable to me that a good family should fall apart for no reason. How much time and money has the prosecution wasted? 900 million dollars in fines from Serono wasn't enough? My kids need their father back and I need for you to know everything we have been through for your mercy. Adam has been punished enough over the last 4 years and so have my family and me. The government did not only take Adam's soul but took the rest of our too. We need to get on and move forward. I have no family here as my Mom and in-laws live in Florida. My brothers as well as Adam's siblings live out of state. What would happen to us without Adam? How will my children ever look at him the same way if more punishment for pleading is given to him? My children know their father is a great, sweet man. It brings tears to my eyes when my 14 year old talks to us about this. I can't help but wonder if he thinks his father is a criminal. We all know he is not and never would be but what does a 14 year old know about how the government treats people to serve their own selfish needs?

 During the trial your honor, the prosecution apparently had a witness they allowed to lie on the stand? Unbelievable….isn't that a crime to lie in court? How do they get away with persuading a witness to change his initial FBI interview on the stand? Was it coaching, was it fear of what they would do to him? Doesn't it prove the prosecution was driven on winning the case no matter what! If I was to comment on Kim Jackson's (the Whistle blower??) character I would have to write a book. It sickens me to think she was awarded millions of dollars for lying. Was she the only one that knew it was illegal

especially when this still goes on today? Did she find out after she left the company so she could blow the whistle for her own profit? Kim was the worst kind of person as she was an influencer like Hitler…someone that could lead others in a direction however her direction was for her benefit only. She took no responsibility for her actions.

Your honor, if I could only meet you there would be more to say with lots of tears and emotion but I know you have seen injustice before and you know my husband was in a no win situation. Please look into your heart and take in all that I have written to you even though you have not lived our nightmare. Let us go on with whatever is remaining in our lives. Our family is what keeps us going and we need it back. This nightmare has scarred us forever and will always be there but if you have the ability to give Adam back his soul by giving him back his life we would be forever in your debt. Our fate is in your hands.

Thank you.

Sincerely,

Susan Sharaby-Stupak



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                        )
UNITED STATES OF AMERICA, )
                        )
            Plaintiff,  )
                        ) Criminal Action No.
v.                      ) 05-10102-JLT
                        )
JOHN BRUENS, MARY STEWART,) April 20, 2007, 10:15 a.m.
MELISSA VAUGHN and MARC   ) Boston, Massachusetts
SIROCKMAN,              )
                        )
            Defendants. )
                        )
```

TRANSCRIPT OF JURY TRIAL - DAY 4
BEFORE THE HONORABLE JOSEPH L. TAURO
UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
ONE COURTHOUSE WAY
BOSTON, MASSACHUSETTS  02210

Marcia G. Patrisso, RPR, CRR
Kimberly A. Smith, RDR, CRR
John J. Moakley United States Courthouse
John J. Moakley U.S. Courthouse
One Courthouse Way - Room 3507
Boston, Massachusetts  02210
(617) 737-8728

1    was it?

2    A.   No.   It was a pure mathematical calculation.

3    Q.   Now, you used the 110 milligram for a prescription;

4    is that right?

5    A.   Yes.

6    Q.   And I believe you said it was an average number?

7    A.   Yes.

8    Q.   And you know, a prescription is a 28-day dose, I

9    guess, if you will?

10   A.   Yes.

11   Q.   And -- but generally the course of treatment was

12   12 weeks, correct?

13   A.   Yes.

14   Q.   But the prescription itself would only be filled,

15   you know, on a monthly basis; is that right?

16   A.   Yes.

17   Q.   So if you were getting a new prescription in the

18   month of March and trying to get those sales recognized

19   in the month of March, you would only be able to

20   recognize one prescription or one out of the three-month

21   course of treatment, correct?

22   A.   Yes.

23   Q.   Now, do you know what the price was that you used

24   for calculating your -- the dosage -- the amount of the

25   cost of the Serostin during this $6-Million-In-Six-Day

1  Plan?

2  A.   The ASP was somewhere around $30 a milligram.

3  Q.   And is that the amount that would be calculated as

4  revenue to Serono?

5  A.   Yes.

6  Q.   And why did you use that number?

7  A.   Because I believe the ISP at that time was around

8  $30.

9  Q.   What is the ISP?

10  A.   ASP.

11  Q.   ASP?

12  A.   Is average selling price.

13  Q.   So that would be the price that you would use for

14  financial data purposes to determine what your projected

15  income was -- revenue was in the month of March?

16  A.   Yes.

17  Q.   So as a result of your calculations, goals were set

18  for each clinical consultant to generate 11 prescriptions

19  per day for six consecutive business days; is that

20  correct?

21  A.   The 11 -- The way the calculation went, we took the

22  six million shortfall divided by 30, roughly, per

23  milligram to get to the total number of Rxs, divide that

24  by 11 -- or 10 -- sorry -- to get to the number of Rxs.

25  And then evenly to divvy them up across all the

1                    C E R T I F I C A T E

2

3

4           We, Marcia G. Patrisso, RPR, CRR, Official

5    Reporter of the United States District Court, and

6    Kimberly A. Smith, RDR, RPR, Court Reporter, do hereby

7    certify that the foregoing transcript constitutes, to

8    the best of our skills and abilities, a true and

9    accurate transcription of our stenotype notes taken in

10   the matter of Criminal Action No. 05-10102-JLT, United

11   States of America v. John Bruens, et al.

12

13

14           _____

15           MARCIA G. PATRISSO, RPR, CRR
             Official Court Reporter

16

17

18           _____
             KIMBERLY A. SMITH, RDR, CRR
19           Court Reporter

20

21

22

23

24

25